**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN WHEELER, JR.,** | ) | **CASE NO. 1:13CV1070** |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **JUDGE JOHN R. ADAMS** |
| | ) | **Magistrate Judge George J. Limbert** |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN** [1], | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

John Wheeler, Jr. ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying his application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the Commissioner's decision and dismiss Plaintiff's complaint in its entirety with prejudice:

I.    **PROCEDURAL HISTORY**

On January 12, 2011, Plaintiff protectively filed an application for DIB alleging that he became disabled on July 8, 2010 due to a back injury which included a degenerative bulging disc, a herniated disc, a disc extrusion, a speech impediment, and depression. Tr.[2] at 144-148, 165-166. The SSA denied Plaintiff's claim initially and on reconsideration. *Id*. at 84-99. Plaintiff filed a request for hearing before an administrative law judge ("ALJ") and on February 28, 2012, an ALJ conducted a hearing where he received testimony from Plaintiff, a medical expert ("ME") and a vocational expert ("VE"). Tr. at 24, 100. Plaintiff was represented by counsel. *Id*. at 24.

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

On April 24, 2012, the ALJ issued a decision finding that Plaintiff was not disabled.  Tr. at 10-20.  Plaintiff requested review of the ALJ's decision by the Appeals Council, but on April 15, 2013, the Appeals Council denied his request for review.  *Id.* at 1-5.  On May 10, 2013, Plaintiff filed the instant suit.  ECF Dkt.  #1.  This case was automatically referred to the undersigned on May 10, 2013 for the issuance of a Report and Recommendation.  On August 15, 2013, Plaintiff filed a brief on the merits.  ECF Dkt. #15.  On September 16, 2013, Defendant filed a brief on the merits. ECF Dkt. # 16.

**II**.  **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

On April 24, 2012, the ALJ determined that Plaintiff suffered from degenerative arthritis, a small herniated disc of the lumbar spine with radiculitis, and anxiety with a history of substance abuse, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c).  Tr. at 12.  The ALJ next determined that Plaintiff does not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").

The ALJ further determined that Plaintiff has the residual functional capacity ("RFC") to perform light work with the following limitations: he had a need to change positions every hour for a few minutes; only occasional bending, stair climbing, stooping, kneeling, crouching, and crawling; a relatively safe work environment with no exposure to unprotected heights, dangerous moving machinery or commercial driving, or the climbing of ladders, ropes or scaffolds; no exposure to severe or less vibration from any source such as a jackhammer; simple, repetitive, routine, low-stress work, with no fast pace, no high or strict quotas; no intense interpersonal interaction with others, such as arbitration, negotiation, supervision, confrontational work or responsibility for the health and safety of others.  Tr. at 14.  The ALJ ultimately determined that Plaintiff was able to perform jobs existing in significant numbers in the national economy and was therefore not disabled.  *Id*. at 19-20.

**III.**  **RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE**

    **A.**  **MEDICAL EVIDENCE**

On July 8, 2010, Plaintiff presented to the emergency room complaining of lower back and

left hip pain after he slipped on a wood chip while lifting a pallet of watermelon at work a month before coming to the emergency room. Tr. at 228, 230, 246. He received a temporary work order from July 8, 2010 to July 22, 2010 limiting his ability to lift and carry objects up to twenty pounds. *Id.* at 22. He was discharged with a diagnosis of L4-L5 disc disease/lumbosacral strain/sprain and was given Norflex and a Medrol dose pack. *Id.* at 230-233, 238.

On July 12, 2010, Plaintiff presented to Medina Hospital for follow-up. Tr. at 246. He reported that he had originally suffered lower back and left hip pain after his work injury, but he did not think much of it until he continued to work and his symptoms worsened. *Id.* He told his employer and medical care was recommended. *Id.* Plaintiff explained that at the emergency room, x-rays were not taken but he was given prednisone and a muscle relaxer, which significantly helped. *Id.* He stated that ice and heat were not helping and he was working light duty four hours per day, but extended walking aggravated his back pain. *Id.* He also felt a left leg weakness and shooting pains into the left thigh with some numbness on the lateral aspect of the left thigh. *Id.* Clinical examination revealed that Plaintiff was not in acute distress, but he leaned to get the pressure off of his left side. *Id.* There was no abnormal curvature of the spine, and no signs of erythema or deformity. *Id.* Plaintiff had range of motion, but right-left lateral bending caused pain towards the left side, and he could slowly squat and rise. *Id.* He had normal deep tendon reflexes, with mildly positive seated straight leg raises on the left with slightly weakened left bilateral lower extremity strength and pain on palpation into the left SI joint. *Id.* He was diagnosed with lumbar sprain and his medications were continued, as well as the use of ice or heat. *Id.* He was given a medical authorization for a MRI of the low back and for physical therapy. *Id.* He was given a temporary work restriction order from July 12, 2010 for two weeks for continuous lifting only up to ten pounds, with occasional (1 to 33% of the day) standing/walking and frequent (34 to 66% of the day) sitting. *Id.* at 247.

On July 16, 2010, Plaintiff presented to Medina Hospital for follow-up. Tr. at 243. He reported that up through the day prior, he was doing well and had not noticed a significant amount of pain and was going to ask for release to general duty. *Id.* However, prior to arriving at the follow-up, he went to work under light duty to see how well he could walk around the plant and his

pain levels started to rise to the point where he did not feel that he could be released. *Id*. He indicated that his pain level was 5 or 6 on the scale of 10 and he noticed a difference when he rested at home. *Id*. The clinical examination indicated that Plaintiff was in no acute distress, he was no longer avoiding placing pressure on his left side and his gait was slightly altered because he favored his left lower extremity. *Id*. Plaintiff was diagnosed with lumbar strain, taken off of the steroid, and advised to take over the counter anti-inflammatory medications. *Id*. He was given a return to work order restricting him to lifting only up to ten pounds continuously. *Id*. at 243-244.

On July 26, 2010, Plaintiff presented to Medina Hospital for a follow-up, stating that his pain level was a 2 or 3 on a pain level up to 10 and he was taking Norflex on an as-needed basis. Tr. at 240. He related that he had not been working because light duty jobs were not available that he had been able to tolerate. *Id*. He indicated that he had not yet started physical therapy or had his MRI, but worker's compensation had approved those modalities. *Id*. Clinical examination showed that Plaintiff was in no acute distress, he continued to lean to the right to keep pressure off of his left side, and his gait was still slightly altered. *Id*. His seated straight leg raise on the left was positive and he was able to squat and rise without difficulty. *Id*. He was diagnosed with lumbar strain, told to continue his medications, and his MRI and physical therapy were scheduled. *Id*. A new work restriction order was completed beginning July 26, 2010 for two weeks, restricting Plaintiff to lifting only up to ten pounds, standing and walking only occasionally (1 to 33% of the day) and sitting frequently (34-66% of the day). *Id*. at 241.

Plaintiff was evaluated for physical therapy on July 28, 2010 by Marymount Hospital Rehab Services. Tr. at 268, 274. Goals were set and his rehabilitation potential was assessed as excellent. *Id*. at 275. He reported that he had tried to lift a 45 to 50 pound pallet and his pain worsened. *Id*. at 276.

A July 29, 2010 MRI of Plaintiff's lumbar spine showed a minimal bulging disc at L2-L3 without significant central canal or neural foraminal stenosis and a bulging disc, facet, at L3-L4, with minimal central canal narrowing and minimal neural foraminal narrowing. Tr. at 257. The MRI also showed a diffusely bulging disc and small focal central disc extrusion at L4-L5 resulting in mild central canal stenosis and lateral left lateral recess as well as mild neural foraminal

-4-

narrowing more severe on the left.  *Id.*  The MRI further revealed a bulging disc at L5-S1, with facet arthropathy and ligamentous hypertrophy resulting in marginal involvement traversing bilateral S1 nerve roots and no significant neural foraminal stenosis.  *Id.* at 258.  The L5 vertebral body was partially sacralized on the left.  *Id.*  An August 27, 2010 MRI of Plaintiff's left hip showed no abnormality.  *Id.* at 254.

Plaintiff was discharged from physical therapy at Marymount on September 23, 2010 after nine sessions.  *Id.* at 264.  Plaintiff was discharged because he reported that he was receiving physical therapy elsewhere.  *Id.*  Physical therapy notes dated August 23, 2010, Plaintiff's last date of services, showed that he complained of a nagging left hip pain over the weekend but was pain free at the time of this therapy.  *Id.* at 265.  His gait was found to be within normal limits.  *Id.*  Plaintiff was able to lift 28 ½ pounds from the floor to his waist for ten repetitions and showed good mechanics.  *Id.*  Therapy notes from August 20, 2010 showed that Plaintiff reported stiffness but was able to lift 28 ½ pounds and tolerated the lifting well.  *Id.* at 266.  August 18, 2010 therapy notes indicated that Plaintiff reported feeling a lot less pain and his lifting mechanics were improving, as well as his endurance.  *Id.* at 267.  Therapy notes from August 16, 2010 show that he continued to have episodes of aggravation of his left hip and buttock.  *Id.* at 268.  His rehabilitation potential was described as excellent.  *Id.*  Plaintiff reported increased pain when he was mowing his grass, rating his pain level at 5 out of 10.  *Id.* at 269.  On August 11, 2010, Plaintiff reported that he felt better when he was active and he tolerated therapy well.  *Id.* at 270.  Notes from August 9, 2010 showed that Plaintiff reported stiffness and he had pain with certain movements, such as walking long distances and tying his shoes.  *Id.* at 271.  August 4, 2010 therapy notes showed that Plaintiff reported nagging pain on the left side.  *Id.* at 272.  Notes from August 2, 2010 reveal that Plaintiff rated his pain at 3 on a scale of 10 and he had pain with tying his shoes, bending at the waist and prolonged sitting.  *Id.* at 273.

Plaintiff underwent evaluation with Orthopaedic Services Physical Therapy on September 22, 2010 and it was recommended that he receive therapy three times per week for six to eight weeks.  Tr. at 345.  Plaintiff rated his pain as 4 to 5 on a scale of 10 and he was assessed as having symptoms consistent with lumbar strain and possible derangement of his lumbar spine.  *Id.* at 343-

345.  On October 13, 2010, Plaintiff rated his pain as 4 of 10 as he was sore upon waking and from driving his car.  *Id.* at 347.  Plaintiff reported no pain on October 18, 2010 due to taking it easy over the weekend.  *Id.*  On October 20, 2010, Plaintiff reported that he was pain-free with inactivity, but his pain returned at the end of the day with a lot of activity.  *Id.* at 346.  His range of motion was within normal limits, he had full strength in his lower extremities and no tenderness upon palpation, but he had positive straight leg raising on the left.  *Id.*  On October 22, 2010, Plaintiff rated his pain at 3 of 10.  *Id.* at 348.  Plaintiff canceled his October 25, 2010 appointment.  *Id.*  At his October 29, 2010 appointment, Plaintiff reported that he was lifting weights at the gym and he rated his pain at 7 of 10 after sitting at his desk.  *Id.*  On November 1, 2010, Plaintiff reported that he felt well and his pain was 0 of 10.  *Id.* at 340.  On November 5, 2010, Plaintiff reported that his pain was decreasing and was 0 of 10, but pain still occurred two to three times per week rather than four to five times per week.  *Id.* at 339.  His lumbar spine range of motion was within normal limits, he had no significant tenderness upon palpation and he had intact reflexes and normal strength.  *Id.*  It was opined that Plaintiff may be ready to try modified duty for his return to work.  *Id.*  On November 19, 2010, Plaintiff rated his pain at 4 of 10 and he displayed full strength in his lower extremities, positive straight leg raising, and normal neurological results.  *Id.* at 341.

On November 22, 2010, Dr. Forcier, Plaintiff's treating physician, recommended a permanent restriction against Plaintiff lifting more than fifteen pounds.  Tr. at 333.  On December 15, 2010, Dr. Forcier completed a form for the Bureau of Vocational Rehabilitation diagnosing Plaintiff with lumbar sprain/strain and reporting that his medication was Lodine, 400 milligrams, twice per day.  *Id.* at 337.  He indicated that he last examined Plaintiff on December 14, 2010 and he found that Plaintiff's functional limitations were permanent, his disabling condition was stable, and he was medically released to work with accommodations of lifting no more than fifteen pounds.  *Id.*  He indicated that Plaintiff's ability to lift and carry was affected by his impairment in that he could lift up to twenty pounds occasionally and up to ten pounds frequently or negligible amounts constantly.  *Id.* at 338.  He opined that Plaintiff's ability to push and pull was limited to fifteen pounds, his abilities to stand and walk were not affected, and he could bend occasionally, and squat, crawl, climb frequently.  *Id.*

-6-

On December 7, 2010, Plaintiff was evaluated by Dr. Marc Soloman upon referral by Dr. Forcier.  Tr. at 423.  Dr. Soloman noted Plaintiff's medical history and the MRI findings, and upon physical examination, he found that Plaintiff had mild pain to palpation over his lumbar spine with normal spine range of motion.  *Id.* at 424.  He diagnosed lumbar sprain and strain and thoracic or lumbosacral neuritis or radiculitis, unspecified.  *Id.*  He suggested starting Plaintiff on Neurontin, adding Nucynta, scheduling Plaintiff for an epidural steroid injection, and referring Plaintiff to a spine surgeon for consultation.  *Id*.

On March 15, 2011, Plaintiff presented to Broadway Orthopaedics and Sports Medicine for evaluation.  Progress notes show that Plaintiff had spasms and palpable or visual evidence of inflammation in his lumbar spine and the treatment recommendations included interferential stimulation, hot packs, cold packs, mechanical traction, massage therapy, trigger point therapy, neuromuscular reeducation, therapeutic activities, and specific spinal manipulation twice weekly for six weeks.  *Id*. at 380.

On March 17, 2011, Dr. Clive Sinoff of Broadway Orthopaedics and Sports Medicine completed an assessment indicating that rather than the initial diagnosis of sprain of the lumbar region, the correct diagnosis was enthesopathy of the hip region.  Tr. at 397.  He noted that there was evidence of injury to the tendons and ligaments to the ischial tuberosity, the sacrum, and the greater trochanter which were at the fibro-osseous attachments and could not be seen on a CT or MRI.  *Id*.  He prescribed Oxycodone and recommended continued chiropractic therapy.  *Id*.

On April 1, 2011, Dr. Artour Wright, a Chiropractic Physician, drafted an initial examination report indicating that Plaintiff presented to the office on March 15, 2011 complaining of lower lumbar pain with associated pain into the gluteal region and down his left leg.  Tr. at 384.  Dr. Wright described Plaintiff's injury as occurring on June 8, 2010 when Plaintiff was attempting to lift a pallet at Aldi's and slipped and felt a pull in his back.  *Id*.  Plaintiff rated his pain as 8 to 10 on a 10-point scale, with spasms and problems with weight-bearing activities and having to place a pillow under his buttocks in order to maintain a seated posture.  *Id.*  Dr. Wright indicated that upon physical examination of Plaintiff's lumbar spine, there was moderate tenderness and guarding, with no signs of bruising or swelling, but deficits in all lumbar ranges of motion, diminished reflexes, and

weakness upon muscle strength testing.  *Id*. at 385.

Dr. Wright opined that based upon his clinical findings, as well as those of Dr. Forcier and the other doctors, and the x-rays, a MRI and Plaintiff's medical history, Plaintiff's accident at Aldi's directly led to the aggravation of pre-existing degenerative changes at the lumbar spinal segments. Tr. at 385.  His diagnosis was substantial aggravation of pre-existing degenerative disc disease at L3-L4, L4-L5, and L5-S1.  *Id*.  He outlined his treatment plan which included two phases: the therapeutic phase and the rehabilitative care phase.  *Id*. at 385-386.  The therapeutic phase which began on March 15, 2011 consisted of treating Plaintiff six times over three weeks, with spinal manipulation, heat therapy, electrical muscle stimulation, manual and mechanical traction, therapeutic exercises, massage therapy, ultrasound, myofascial release technique and trigger point therapy.  *Id*. at 386.  The rehabilitative phase beginning on April 15, 2011 consisted of treating Plaintiff six times over three weeks, with spinal manipulation, heat therapy, manual and mechanical traction, electrical muscle stimulation, massage therapy, myofascial release, and specific rehabilitative exercises including neuromuscular reeducation.  *Id*.

Dr. Wright noted that Plaintiff's subjective complaints were substantiated by the objective findings which included static and kinetic palpation, orthopedic assessment, neurological tests and range of motion analysis.  Tr. at 386.  He indicated that several malingering tests were performed and Plaintiff proved consistent throughout the examinations.  *Id*.

On April 28, 2011, Dr. Shtull performed a consultative examination of Plaintiff at the request of the agency.  Tr. at 352.  Plaintiff reported that he still suffered from back problems that caused pain in his buttocks and down his left leg.  *Id*.  He indicated that although back surgery was recommended, it was not performed because Worker's Compensation would not approve it.  *Id*.  It was noted that Plaintiff received medications and physical therapy but no injections.  *Id*.  Plaintiff reported performing home exercises which help and he stated as to his lower back that "I don't feel too much in the back" but he had constant left lower extremity radiation mostly to the knee but occasionally to his left foot.  *Id*.  He rated his pain level at 8 of 10 and opined that he could sit for two to three hours and walk for forty-five minutes.  *Id*.  Plaintiff's medications were listed as Percocet as needed for pain, with Plaintiff reporting that he last took it three days prior, and Motrin,

-8-

which he took that day.  *Id*. at 352-353.  Plaintiff reported that with pain, he cooked and cleaned daily, did laundry once per week, shopped twice per week, watched his children four times per week, showered daily, and could dress himself, watch television, read, and visit with friends. *Id*. at 353.

Physical examination revealed that Plaintiff's gait was "very minimally antalgic" without assistive devices, with no acute distress, but some discomfort on the examination table as Plaintiff leaned to sit on the right buttock after a portion of the examination.  Tr. at 353-354.  Plaintiff had no difficulty moving on and off the table, and the examination was unremarkable, with Dr. Shtull diagnosing Plaintiff with left lower extremity radiculopathy and degenerative disc disease.  *Id*. at 355-356.  She opined that Plaintiff "does have limitations with respect to his lower back and left lower extremity sciatica." *Id.* at 356.  She noted Plaintiff's report of his sitting tolerance to two to three hours and his walking tolerance of 45 minutes, and she opined that Plaintiff's lower extremities should not be exposed to vibratory forces, and he should not climb ladders or scaffolds, perform repetitive bending or twisting at the waist, and should not stoop, crawl or kneel.  *Id*.

On May 12, 2011, Dr. Sinoff added a note to his March 17, 2011 assessment to the Bureau of Worker's Compensation.  Tr. at 393.  He indicated that Plaintiff continued to have back pain which was reduced from 5 of 10 to 2 of 10 with Percocet.  *Id*.  He noted that objectively, there was mild to moderate tenderness over Plaintiff's left gluteous maximus at the medial attachments.  *Id*.  He reported that Plaintiff continued to suffer pain from his work-related injury but was getting reasonably good pain relief from his current medication.  *Id.*

Progress notes from Broadway Orthopaedic and Sports Medicine showed that on May 18, 2011, Plaintiff reported constant pain at a level of 4 or 5 which sometimes rose to 10 of 10.  *Id.* at 377.  Lumbar spasms and palpable or visual observations of inflammation in his lumbar spine were noted.  *Id*.  Progress notes from May 26, 2011 show that Plaintiff complained of pain shooting down his left leg from his back to his buttocks to his interior calf.  *Id*.  at 376.  He reported that the mornings were bad and walking and standing were painful at times but at other times, he had very little to no pain.  *Id.*  He was stretching at home and using Percocet or Motrin when needed on bad days.  *Id*.  June 20, 2011 progress notes show that Plaintiff reported pain of 5 to 6 on a 10-point scale

and he was using 1 to 2 Percocet for pain. *Id*. at 392. Notes from July 18, 2011 show that Plaintiff had no change in his pain which still varied from 2 to 8 on a scale to 10. *Id*. at 389. Plaintiff was again prescribed Percocet and Naproxen. *Id*. at 390-391. July 28, 2011 progress notes show that Plaintiff reported pain at a level of 10 of 10 in his lower back with numbness and tingling in his left leg to his foot. *Id.* at 374. His gait was antalgic as he walked with a limp and therapy was again recommended. *Id*. at 375. Notes from August 23, 2011 also show evidence of muscle spasm in the L4-5 region and the continuation of therapy was again recommended due to Plaintiff's unresolved pain and impairment. *Id*. at 373. August 28, 2011 notes show that Plaintiff reported that his lower back pain was a 2 or 3 on a scale of 10 and half of his days now were less painful but he still had bad days where the pain was a 10 of 10. Tr. at 372. He also indicated that his left leg was always fatigued. *Id*. Physical examination revealed that Plaintiff's lumbar spine had a restricted range of motion, spasms and palpable or visual observation of inflammation. *Id.* Plaintiff's progress was deemed erratic, and his prognosis was good at the present time but guarded overall based upon the nature of his complaints, the soft tissue adhesions of the injured region, the biomechanics of the injury and consistent occurrence of muscle spasms. *Id.* Recommendations included continued therapy. *Id*. Progress notes from September 21, 2011 indicate that Plaintiff reported little change in his condition and his pain escalated when he engaged in excess physical activities. Tr. at 387. Dr. Wright reiterated his opinion that Plaintiff's lumbar spine condition at L4-L5 was directly and casually related to the injury he sustained at Aldi's and he should be referred to pain management. *Id*. at 387.

Progress notes from October 17, 2011 show that Plaintiff reported more good days than bad days over the last two to three months. Tr. at 425. Plaintiff's progress was evaluated as consistent, but his prognosis was still good at the time but guarded overall due to the nature of his complaints and the biomechanics of his injury. *Id.* It was recommended that Plaintiff continue with therapy as needed for flare-ups of pain. *Id.* He was advised to follow-up with a pain management specialist and then follow-up with Dr. Wright in the next one to two months. *Id.*

As to Plaintiff's mental impairment, Dr. House, Ph.D., a psychologist, conducted a consultative examination for the agency on July 1, 2011. Tr. at 363. Plaintiff reported that he was

-10-

divorced and had three children, ages 3 to 11, with whom he shared custody with their mother. *Id.* at 364. Plaintiff denied the current use of drugs, but he stated that he may have used cannabis a few months prior to the examination and he drank two to three times per week. *Id.* at 365.

Plaintiff reported that he was anxious and depressed and he was never on psychotropic medication, but he was in counseling before sometime in 2011. *Id.* Dr. House found that Plaintiff was impulsive, sometimes saying things that he did not mean, and while he did stutter, his speech was understandable. *Id.* at 365-366. His eye contact was direct and he denied depression, although he stated that he was sad, mainly because of his job loss, and he denied suicidal thoughts. *Id.* at 366.

Dr. House found Plaintiff to be oriented to time, place and partially for time, with adequate pace and persistence. Tr. at 367. He had fairly intact remote memory. *Id.*

Dr. House diagnosed Plaintiff with anxiety disorder, not otherwise specified, and alcohol abuse and cannabis abuse, in reported remission. Tr. at 368. He opined that Plaintiff self-medicates his anxiety disorder to some degree. *Id.* He further opined that Plaintiff had generally intact memory and broad average intellectual functioning, as well as concentration and attention. *Id.* at 369. As to social functioning in terms of responding appropriately to supervision and coping with co-workers in a work setting, Dr. House opined that Plaintiff found no major difficulties and he found no evidence that Plaintiff would be oppositional or obstructionistic in such situations. *Id.* As to Plaintiff's ability to respond to work pressures in a work setting, Dr. House found that Plaintiff was stressed to some degree with his employment issues and seemed to be self-medicating. *Id.* He opined that while this suggested that Plaintiff had somewhat limited emotional resources, they were not so limited as to result in Plaintiff engaging in major disruptive activity. *Id.* Dr. House opined that Plaintiff would most likely withdraw or isolate and not be present in a stressful situation. *Id.*

Dr. House opined that Plaintiff was only mildly impaired in his employability due to his moderate levels of anxiety and that the bulk of his difficulties revolved around his physical issues. Tr. at 370. He did recommend that Plaintiff participate in substance abuse treatment and he suggested that if Plaintiff receive DIB, he should be assigned a payee. *Id.* at 368.

### B.      TESTIMONIAL EVIDENCE

At the hearing, Plaintiff testified, as well as a ME and a VE. Tr. at 25. Plaintiff testified that

-11-

he was five feet, ten inches tall and weighed 195 or 200 pounds. *Id*. at 27. He reported that he had shared custody of three children with his ex-wife, and their ages were 11.5, 9.5 and 3.5 and he had the children on Tuesdays, Wednesdays, Thursdays until 8:00 p.m., and every other weekend. *Id*. at 27-28. He indicated that he had a car, drove the car every day that he had his children, and he had driven to the hearing. *Id*. He has some college education and was currently taking an online class at the community college. *Id*. at 28. He last worked at Aldi's in 2010. *Id*.

Plaintiff discussed his impairments, indicating that he had no major surgeries, last treated with a doctor four to five months prior, and his last prescription was given to him three months ago. Tr. at 30-32. He described his pain as shooting down his left leg down to his foot on a daily basis and getting worse on days where he was more active. *Id*. at 33. He rated his pain at a 4 of 10 and indicated that sometimes it was mild and other times it was severe. *Id*. He also reported having back pain five to six times per month for two to three weeks at a time. *Id*. at 34-35. When the ALJ indicated that such a time would equate to more than a month, Plaintiff explained that his pain was everyday when he was first injured and he has since found a way to live with the pain by knowing what he can do and what he cannot. *Id*. at 35. He noted that the last time he had back pain was when he moved to a new home and it took him two weeks to recover. *Id*.

When asked if he had other medical problems, Plaintiff reported that he saw a psychologist who said that he had anxiety and had problems with alcohol. Tr. at 35. Plaintiff informed the ALJ that he drinks one to two beers everyday and sometimes drinks hard liquor. *Id*. at 35-36. He noted that he had a prior driving under the influence conviction from 2009 and had missed work in the past due to his drinking. *Id*. at 36. He also indicated that he had a stuttering problem ever since he started talking. *Id*. at 37. He also discussed suffering from depression, indicating that he did not take medication for depression, but usually drank alcohol to alleviate his depression. *Id*. When asked how often he felt depressed, Plaintiff responded that he was content with his life as of late and he was doing pretty well. *Id*.

Plaintiff opined that he could stand on his feet for thirty-five to forty minutes at a time before having to sit down and he could walk for thirty to forty minutes at a time. Tr. at 38. He related that he had trouble sitting in a chair because of the pain, but he could sit for ten to fifteen minutes before

-12-

the pain would start.  *Id*. at 39.  He indicated that he tries to lean to the right in order to take the pressure off of his left leg.  *Id*.  He also stated that he could go up and down stairs, but not without pain for the most part, and he could bend over and touch the floor from a standing position but then would "be done" if he did so.  *Id*.  He further opined that he could squat down by bending his knees, and could probably lift ten to twenty or thirty pounds off of a table if he did not have to bend over in order to do so.  *Id*. at 39-40.  When asked about activities that aggravated his pain, Plaintiff responded that trying to clean his bathtub or toilet or driving his car aggravated his pain.  *Id*. at 40.  He reported that he dresses, feeds, and bathes his three year-old, thirty-pound son when he has him and can pick him up if he has to do so.  *Id*. at 41.  He indicated that he cooks and cleans and washes the clothes, but his oldest son brings the laundry up and down the steps for him.  *Id*. at 41-42.  He does the grocery shopping and visits with his parents, best friend and grandparents, he enjoys reading,  and he produces other people's music as a hobby.  *Id*. at 42-43.  He indicated that he made three recordings over the past month and produces a total of 13-14 times per year.  *Id*. at 43.

Upon questioning by his attorney, Plaintiff indicated that he could sit thirty to forty minutes at a time if he were able to lean and get up and walk around for awhile.  Tr. at 44.  He also noted that his three year-old son was able to get in and out of the bathtub on his own.  *Id*. at 45.

The ME then testified.  Tr. at 46.  He reviewed Plaintiff's medical history and opined that Plaintiff's impairments did not meet or equal any of the Listings.  *Id*. at 49.  Based upon his physical impairments, the ME opined that he agreed with one of Plaintiff's physicians who indicated that Plaintiff  could perform light level work, lifting and carrying up to ten pounds frequently and twenty pounds occasionally.  *Id*.  The ME also limited Plaintiff's walking, standing and sitting to six of eight hours with the ability to change positions every hour for a few minutes.  *Id*.  He additionally imposed limitations of occasional bending and climbing stairs, no climbing of ladders, no exposure to unprotected heights, unprotected machinery and no commercial driving of a vehicle.  *Id*. at 49-50.  As to his psychiatric impairment, the ME limited Plaintiff to routine, low stress tasks with no high or strict production quotas and no intense interpersonal aspects like arbitration, negotiation, confrontation, having to manage or supervise others, or having to be responsible for the health, safety or welfare of other people.  *Id*. at 50.  Upon questioning by Plaintiff's attorney, the ME also

-13-

agreed that Plaintiff could only occasionally stoop, crouch, kneel or crawl. *Id.* at 51. He further agreed with Plaintiff's doctor who indicated that Plaintiff should not be exposed to vibration, like from a jackhammer. *Id*. at 50-51.

The ALJ then questioned the VE, presenting a number of hypothetical individuals to him, including one who had the background of Plaintiff, with limitations to light work, with a need to change positions every hour for a few minutes, only occasional bending, stair climbing, stooping, kneeling, crouching, and crawling, working in a relatively safe environment, with no exposure to unprotected heights, ladders, ropes or scaffolds, no severe vibration or less from any source, no dangerous moving machinery or driving commercially, with additional limitations to routine, low-stress work with no high or strict quotas, no intense interpersonal interactions with others such as arbitration, negotiation, confrontational work, supervisory work or the responsibility for the health and safety of others. Tr. at 53. When the ALJ asked if such a hypothetical person could perform jobs existing in significant numbers in the national economy, the VE responded that such a person could perform the representative occupations of mailroom clerk, order caller, and housekeeping cleaner. *Id*.

## IV.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of

-14-

> the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).   Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *Id.*; *Walters,* 127 F.3d at 532.  Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VI.  ANALYSIS

### A.  CREDIBILITY ASSESSMENT

Plaintiff first contends that the ALJ's credibility assessment was contrary to law because it did not accurately reflect Plaintiff's testimony or the evidence of record.  ECF Dkt. #15 at 4-8.  For the following reasons, the undersigned recommends that the Court find that the ALJ applied the correct legal standards and substantial evidence supports the ALJ's credibility determination

The social security regulations establish a two-step process for evaluating pain.  *See* 20

-15-

C.F.R. § 404.1529 , SSR 96-7p.  In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain.  *See id.; Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms.  *See id.*  Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities.  *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p.  *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990).  These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40.  Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination.  *See Casey*, 987 F.2d at 1234.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence.  *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

In this case, the first prong is satisfied because the ALJ determined that Plaintiff had severe disorders of the back and anxiety with a history of substance abuse which could "reasonably be

expected to cause the alleged symptoms. " Tr. at 16. Therefore, the remaining question concerns the ALJ's credibility determination related to Plaintiff's complaints of pain. Plaintiff quotes the following paragraph in the ALJ's analysis:

> While the claimant likely experiences pain, it responds to treatment and does not preclude cognitive functioning sufficient to interfere with full-time on-line college courses, daily activities including reading and attending to children or producing for musicians.

ECF Dkt. #15 at 4, quoting Tr. at 18. Plaintiff argues that this analysis is fatally flawed because it is inaccurate and a gross overstatement of his daily activities. ECF Dkt. #15 at 4.

Plaintiff first asserts that the ALJ's statement concerning a correlation between pain and cognitive functioning is erroneous as Plaintiff never argued the existence of such a correlation as he has consistently complained of limited *physical* abilities caused by his pain, not mental abilities. ECF Dkt. #15 at 5. The undersigned cannot determine from the ALJ's statement if the ALJ erroneously believed that Plaintiff was arguing a cognitive correlation or if the ALJ merely inferred that Plaintiff's pain complaints provided sufficient response to treatment because Plaintiff was able to perform mental activities such as concentrating and focusing on things such as college course, reading, attending to his children and producing for musicians.

Plaintiff also asserts that he never testified that he attended online college classes "full-time" as he stated at the hearing that he has a total of 15 credit hours and had just restarted taking online classes. ECF Dkt. #15 at 5, citing Tr. at 29. Earlier in his decision, the ALJ acknowledged that Plaintiff had 15 total credit hours in online classes and that he was pursuing online classes at his convenience. Tr. at 14. However, the ALJ did erroneously find that Plaintiff was attending online classes full-time. Tr. at 18. Plaintiff contends that this finding erroneously led the ALJ to conclude that Plaintiff's pain was not as severe and limiting as he testified because he could engage in this full-time school activity. ECF Dkt. #15 at 5.

Plaintiff also asserts that the ALJ erroneously discounted his credibility based upon his inability to pursue additional medical treatment beyond that covered by worker's compensation due to his inability to afford health insurance. *Id*. at 7-8. The record shows that

Plaintiff's injury was covered by worker's compensation and the ALJ did find that

> While the claimant suggested limited access to medical treatment due to lack of insurance, the evidence and testimony acknowledge monthly follow-ups associated with a claim of worker's compensation and what appears to be reasonably sustained conservative medical care since the onset, which does not appear supportive of total disability or lack of access to treatment.  The claimant acknowledges improvement in pain with treatment and medication as well as variable pain ranging from mild to a worsened state with activity, which daily chronic pain averaging a 4 suggests reasonable stability in symptoms with treatment.

Tr. at 18.  The undersigned notes that the record does show that Plaintiff received relatively consistent and conservative treatment as covered by worker's compensation, as found by the ALJ.  However, the record also shows that Plaintiff's doctors recommended that he receive lumbar epidural steroid injections and a spinal surgeon consult, but according to Plaintiff, worker's compensation denied such requests.  *Id.* at 47, 424.  Accordingly, while the undersigned finds that the ALJ's focus in this paragraph was more about the conservative treatment that Plaintiff consistently received and the impact that it had on reducing his pain rather than Plaintiff's lack of pursuit of further treatment, it did not address the fact that more invasive treatment was recommended by Plaintiff's doctors but was denied by worker's compensation.

Plaintiff also contends that the ALJ erred in partially discounting his credibility when he relied upon the fact that he produced music for other musicians.  ECF Dkt. #15 at 5.  The undersigned recommends that the Court find that the ALJ did not err in relying upon this activity in discounting Plaintiff's credibility.  Plaintiff testified that he produced music 13-14 times per year and had produced music three times in the month that he testified at the hearing.  Tr. at  43.  This type of activity would certainly be an activity that the ALJ could consider since an ALJ can consider other less involved daily activities such as performing household chores, listening to music, and reading in determining credibility.

Plaintiff also asserts error with the ALJ's statement that his pain responds to treatment.  ECF Dkt. #15 at 5.  He cites to numerous instances in which his pain has varied in intensity from a 2 on a 10-point scale to a 10.  *Id.* at 5-6.  He argues that a response to treatment does not necessarily equate to a finding that his pain was reduced to the point where he could work on a full-time basis.

-18-

*Id*. at 5.

Accepting Plaintiff's assertions that the above-cited ALJ findings were erroneous, the undersigned nevertheless recommends that the Court find that such errors are harmless because they are not the main factors and were not the only factors that the ALJ relied upon in discounting Plaintiff's credibility.

As pointed out by the ALJ, the medical evidence substantiates that Plaintiff was responding to medication and treatment. October 7, 2011 physical therapy notes indicated that Plaintiff reported that he had more good days than bad days over the last two to three months.  Tr. at 425.  August 28, 2011 therapy notes indicated that Plaintiff reported that his back pain was a 2 on a 10-point scale and half of his days were now less painful, even though he still had bad days. *Id.* at 372.  Dr. Sinoff noted on May 12, 2011 that Plaintiff was experiencing "reasonably good pain relief on his current medication." Tr. at 393.  Therapy notes from October 18, 2010 and October 20, 2010 also indicate a positive response to treatment. *Id*. at 346-347.  Physical therapy notes indicated on August 18, 2010 that Plaintiff reported feeling a lot less pain, which indicates a response to treatment. *Id.* at 267.

While a response to medication and treatment does not necessarily alone lead to a conclusion that Plaintiff could perform full-time work, this finding, in conjunction with the ALJ's proper analysis of the other evidence in the record, does provide substantial evidence to support his credibility conclusion.  In addition to considering Plaintiff's response to treatment, the ALJ also considered the objective medical evidence which showed mild to moderate degenerative disc disease "at several levels most severe at the L4-L5 and L5-S1 with no more than mild central canal stenosis and mild neural foraminal narrowing at the L4-L5 level due to small disc extrusion, and absence of findings on left hip MRI." Tr. at 16, citing Tr. at 254, 257-258.  The ALJ additionally cited to instances of normal clinical findings, including a minimally antalgic gait, no lower extremity loss of muscle strength, no sensory deficit, and no muscle atrophy.  Tr. at 16, citing Tr. at 353-354; Tr. at 339-341.  He also noted Plaintiff's conservative treatment which included physical therapy, medications, and chiropractic treatment, which he stated helped his pain to such an extent that he was able to mow his grass.  Tr. at 16, citing Tr. at 265-350, 372-424.  The ALJ further cited to the

review of the medical evidence by the ME, who cited to the report of Dr. Forcier, Plaintiff's treating physician, who diagnosed Plaintiff with a stable lumbar strain/sprain and limited Plaintiff to essentially light work. Tr. at 16-17, 49, 337-338. The ALJ also considered Plaintiff's testimony that he last saw a doctor four to five months prior to the hearing, and he last took Percocet three months prior to the hearing which was the last prescription that he had received. Tr. at 15, citing Tr. at 32. He further cited to Plaintiff's testimony that his average pain level was a 4 on a 10-point scale. *Id.* Finally, the ALJ cited to Plaintiff's daily activities, which included caring for his three minor children, including a 3½ year old, driving, cooking, cleaning, washing clothes, grocery shopping, visiting friends and family once a day, producing music, and attending online college classes. Tr. at 14-16; Tr. at 39-43.

Accordingly, while the ALJ did make some erroneous findings, the undersigned recommends that the Court find that the ALJ applied the appropriate credibility standard, adequately articulated his credibility determination, and substantial evidence supports his decision to partially discount Plaintiff's credibility. The ALJ cited to objective medical evidence, Plaintiff's medications and treatment modalities, and Plaintiff's testimony and daily activities in support of his decision to partially discount Plaintiff's credibility.

### B.   RFC AND VE TESTIMONY

Plaintiff also asserts that the ALJ's RFC analysis and the hypothetical individuals that he presented to the VE were not based upon substantial evidence. ECF Dkt. #15 at 9-10. Plaintiff explains that in the first hypothetical individual presented to the VE, the ALJ asked him to assume a person with Plaintiff's age, education and work background, plus limitations to the degree testified to by Plaintiff at the hearing. *Id*. at 9. Plaintiff contends that the VE's response to this hypothetical that no jobs existed in significant numbers for such a person crystallizes the importance of the ALJ's credibility analysis because if Plaintiff were deemed fully credible, a disability finding would be mandated based upon the VE's response.

First, the undersigned has already recommended that the Court find that substantial evidence supports the ALJ's credibility analysis. Thus, the ALJ was not bound by the first hypothetical individual that he presented to the VE. Second, it is the ALJ who makes the ultimate determination

as to RFC and he makes this determination based upon all of the relevant evidence, including the medical records, medical source opinions, and the claimant's subjective allegations and description of his own limitations. 20 C.F.R. §§ 404.1527(e), 1545(a). Third, the standard for reviewing the ALJ's decision is whether substantial evidence supports the ALJ's decision and not whether substantial evidence supports an opposite conclusion.

A claimant's RFC is the most that he can do despite his limitations. 20 C.F.R. § 404.1545(a). Here, the ALJ discussed the medical opinion of Dr. Forcier, who found that despite his lumbar strain/sprain, Plaintiff could perform light work which included lifting up to 10 pounds frequently and twenty pounds occasionally, with only occasional bending and climbing. Tr. at 16-17, 49, 337-338. The ALJ restricted Plaintiff to light work with occasional bending and climbing of stairs. *Id.* at 14. Plaintiff testified that his pain is helped if he is able to sit and stand when necessary. Tr. at 45. The ME also limited Plaintiff's walking, standing and sitting to six of eight hours with the ability to change positions every hour for a few minutes. *Id.* Although Dr. Forcier found that Plaintiff's abilities to stand and walk were not affected by his impairments, the ALJ gave Plaintiff the benefit of the doubt and limited Plaintiff's standing and walking to the light work restriction of six of eight hours per workday. *Id.* at 14, 26, 38-40, 338. The ALJ also relied upon the testimony of the consultative physician Dr. Shtull, the ME's testimony, and Plaintiff's own testimony, and additionally imposed limitations of occasional bending and climbing stairs, no climbing of ladders, occasionally stooping, crouching, kneeling or crawling, no exposure to unprotected heights or unprotected machinery, no commercial driving of a vehicle, and no exposure to severe or less vibration from any source such as using a jackhammer. *Id.* at 14, 39-40, 49-51, 356. As to his psychiatric impairment, the ALJ relied upon the opinions of consultative psychologist Dr. House and the ME in limiting Plaintiff to routine, low stress tasks with no high or strict production quotas and no intense interpersonal aspects like arbitration, negotiation, confrontation, having to manage or supervise others, or having to be responsible for the health, safety or welfare of other people. *Id.* at 50.

Since the undersigned recommends that the Court find that substantial evidence supports the ALJ's credibility determination and Plaintiff does not challenge the ME's testimony or otherwise

provide evidence that his impairments produced greater restrictions than those found by the ALJ, the undersigned recommends that the Court find that substantial evidence supports the ALJ's RFC.

As to the hypothetical individuals presented to the VE by the ALJ, an ALJ is under no duty to incorporate a claimant's unsubstantiated complaints into the hypotheticals posed to the VE. *Griffith v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir.2007) ("The rule that a hypothetical question must incorporate all of the claimant's physical and mental limitations does not divest the ALJ of his or her obligation to assess credibility and determine the facts. In fashioning a hypothetical question to be posed to a vocational expert, the ALJ is required to incorporate only those limitations that he accepts as credible.") (internal citations omitted).  A VE's testimony will provide substantial evidence to support an ALJ's decision only when the testimony is elicited in response to a hypothetical question which accurately portrays the claimant's physical and mental limitations. *Parley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987).  Here, the undersigned recommends that the Court find that the ALJ's second hypothetical individual as presented to the VE accurately portrayed Plaintiff's physical and mental limitations, with the additional restriction to vibration presented near the end of the VE's testimony. Tr. at 14, 19-20, 53-57.  As such, the undersigned recommends that the Court find that the VE's testimony provided substantial evidence to support the ALJ's conclusion that Plaintiff was able to perform jobs existing in significant numbers in the national economy and was therefore not disabled.

## VII.  CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint in its entirety with prejudice.

DATE: April 24, 2014                                      */s/George J. Limbert*
                                                          GEORGE J. LIMBERT
                                                          UNITED STATES MAGISTRATE JUDGE

Any OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's

recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).